UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE GRAY, et al., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV00881 ERW |
| | ) | |
| CITY OF VALLEY PARK, MISSOURI, | ) | |
| | ) | |
| Defendant(s). | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendant's Motion for Summary Judgment [doc. #53], Plaintiffs' Motion for Summary Judgment [doc. #73], and Plaintiffs' Motion for Sanctions [doc. #117].

**I. BACKGROUND**

On February 14, 2007, the City of Valley Park (Defendant or "the City") enacted Ordinances No. 1721 and No. 1722. Plaintiffs' filed suit in the Circuit Court of St. Louis County on March 14, 2007, against the Defendant, seeking to invalidate both Ordinances. Ordinance No. 1721 addressed landlords leasing to illegal immigrants ("landlord provision") and Ordinance No. 1722 addresses the employment of illegal immigrants ("employment provision"). Defendant filed a Motion to Remove the case on May 1, 2007. Plaintiffs then filed a Motion to Remand, which was denied. Subsequently, the City has repealed Ordinance No. 1721, leaving only Ordinance No. 1722, the landlord provision, at issue in this suit. Plaintiffs' filed a Motion for Preliminary

1

Injunction on April 19, 2007, which is currently pending.[1]  Plaintiffs also filed a Motion for

Issuance of a Declaration that Valley Park Ordinance No. 1722 is inoperative.  On November 19,

2007, this Court held a hearing on Plaintiffs' Motion for Summary Judgment, Defendant's Motion

for Summary Judgment, and Plaintiffs' Motion for sanctions.  The Court will now address each

pending motion, in turn.

## II.  MOTION FOR ISSUANCE OF A DECLARATORY JUDGMENT

The Court will very briefly address Plaintiffs' Motion for Issuance of a Declaratory

Judgment.  Plaintiffs' filed their motion on the basis that Ordinance No. 1722[2] did not become

effective until an appeal had been taken in the state court case of *Reynolds v. City of Valley Park*,

06-CC-3802, in St. Louis County Circuit Court ("*Reynolds*"), a case currently before the state

court.  In an effort to remedy any confusion,[3] the Board of Alderman met at a special meeting on

August 9, 2007.  In that meeting the Board of Alderman passed Ordinance No. 1736, which

restated the text of Ordinance No. 1722, and clarified the effective date, making the Ordinance

---

[1]The Court notes that the procedural posture of this case is a motion for preliminary injunction.  However, Defendants agreed to refrain from any enforcement action of Ordinance No. 1722 until a ruling on its legality had been entered by this Court.  Therefore, rather than addressing Plaintiffs' likelihood of success on the merits, the Court allowed discovery to go forward, and now has before it fully briefed summary judgment motions.  There is therefore no need to discuss the factors to be considered in ruling on a preliminary injunction.  The Court therefore denies as moot Plaintiffs' motion for a preliminary injunction.

[2]The Court refers, throughout the opinion, to Ordinance No. 1722, however, the Court notes that the Ordinance at issue is more accurately referred to as Ordinance No. 1736.  Although Ordinance No. 1736 did not repeal Ordinance No. 1722, it amended the effective date, and restated the text of Ordinance No. 1722 in its entirety.  The substance of the two Ordinances is identical, and therefore the Court's ruling addresses the effectiveness of both Ordinances.

[3]Plaintiffs attribute a less forthright motive to Defendant, however, the Court takes Defendant's counsel's comments at face value.

immediately enforceable.[4]  Plaintiffs' then sought to amend their Complaint, alleging that Ordinance No. 1736 was enacted in violation of the Missouri Sunshine Act.  In an effort to prevent any further arguments from Plaintiffs regarding the Ordinance's validity, and to address the merits of the pending litigation, the Board of Alderman re-enacted Ordinance No. 1736 at the regularly-scheduled meeting on August 20, 2007, thus nullifying Plaintiffs' contention that the August 9, 2007 meeting was not lawfully convened.  Since the Court finds that the second re-enactment of Ordinance No. 1736 was lawful, the issue of whether it was originally lawfully enacted is moot.  Furthermore, the subject of the original Motion for Issuance of a Declaratory Judgment, was mooted by the enactment of Ordinance No. 1736, which clarified the effective date.  Therefore Plaintiffs' Motion is denied.

## III.  MOTION FOR EVIDENTIARY SANCTIONS

The Court will first address Plaintiffs' Motion for Sanctions for Spoilation of Evidence, as a ruling on this motion will determine whether evidence of the Mayor's comments during a March 5, 2007 public meeting is admissible in support of or in opposition to the pending motions for summary judgment.[5]

### A.  LEGAL STANDARD

A district court possesses the inherent power to impose sanctions against a party and it's attorney for the destruction of evidence.  *See Dillon v. Nissan Motor Company, Ltd.*, 986 F.2d 263, 267 (8th Cir. 1993); *see also Hughes v. Black & Decker, Inc.*, 2007 WL 107680, *1 (D.

---

[4]However, as the Court noted above, the City agreed to refrain from enforcement pending the outcome of the present litigation.

[5]The Court notes that the Parties dispute whether a determination of the Mayor's discriminatory intent is required for a ruling on Defendant's summary judgment motion.  The Court will address this question in detail in its discussion of the motions for summary judgment; for the purposes of this Motion, the Court assumes that the evidence is relevant.

Minn. Jan. 10, 2007) ("District courts have inherent authority to impose sanctions when a party destroys evidence . . ..").  The district court in *Hughes* specifically found that such a penalty is warranted when the party knew or should have known that the evidence is relevant to potential litigation.  *Hughes*, 2007 WL 107680, at *1.  However, "[b]efore a sanction for destruction of the evidence is appropriate, . . . there must also be a finding that the destruction prejudiced the opposing party."  *Dillon*, 986 F.2d at 267.

### B.  DISCUSSION

This motion raises a number of issues for the Court to resolve in determining whether sanctions are appropriate.  First, the Court must determine whether a finding of bad faith is required before any sanctions may be imposed.[6]  Secondly, the Court must determine whether the destruction of the alleged statement prejudiced the Plaintiffs.  Thirdly, the Court must determine whether the evidence is sufficient to show the existence of a written statement.  Lastly, if the prior three issues are decided in Plaintiffs' favor, the Court must determine whether the standard for sanctions has been satisfied.  Plaintiffs seek to prevent the Defendant from making any arguments based upon the Mayor's apology made during the March 5, 2007 meeting, due to the destruction of the text of that statement, however, they do not seek an adverse inference instruction, nor do they seek the dismissal of the action.  Defendant disputes that sanctions are warranted.

The Court will first address the bad faith requirement.  The District of Minnesota addressed this exact question in *Hughes*, and held that "[a] finding of bad faith is necessary to impose certain sanctions, such as an outright dismissal or an adverse-inference instruction.  But the Court may impose other types of sanctions in the absence of a bad-faith finding."  *Hughes*,

---

[6]For purposes of their motion, Plaintiffs do not argue that the destruction was done in bad faith.

4

2007 WL 107680, at *1 (internal citations omitted). This conclusion is further supported by Eighth Circuit case law. *See Stevenson v. Union Pacific Railroad Company*, 354 F.3d 739, 745 (8th Cir. 2004) ("Our interpretation of Supreme Court authority concerning a court's inherent power to sanction counsels that a finding of bad faith is not always necessary to the court's exercise of its inherent power to impose sanctions."); *see also Menz v. New Holland North America, Inc.*, 440 F.3d 1002, 1006 (8th Cir. 2006) ("[T]o warrant dismissing a case as a sanction for spoilation of evidence there must be a finding of intentional destruction indicating a desire to suppress the truth." (internal quotation omitted)). The Eighth Circuit in *Stevenson* found that while the Eighth Circuit upheld the imposition of sanctions in the nature of the exclusion of evidence based on the "knew or should have known standard," that lower negligence standard did not apply to cases where an adverse inference instruction is given. 354 F.3d at 747, n. 2. The only sanction that Plaintiffs seek is the exclusion of any evidence relating to the former Mayor of Valley Park's apology, made during the March 5, 2007 meeting. Therefore, the Court concludes that a finding of bad faith is not required.

The Court next looks at whether the Plaintiffs have been prejudiced by the alleged destruction of any notes or transcript of the Mayor's apology. Defendant argues that there is no prejudice, because the contents of the apology is available through other sources, namely a newspaper article that was written following the meeting. Plaintiffs' dispute that this is adequate, and argue that the exact wording is at issue because of conflicting testimony, and therefore Plaintiffs are harmed by the Defendant's alleged destruction. The Eighth Circuit in *Dillon*, found prejudice when plaintiff destroyed the car that was at issue in a products liability action. 986 F.2d at 268. The Eighth Circuit dismissed the plaintiff's argument that photographs documenting the condition of the car were sufficient, because the photographs were not comprehensive. *Id.* This

is exactly the situation before the Court. While there is clearly other evidence regarding the contents of the Mayor's apology, including the newspaper article, the testimony of the alderman who were present at the meeting, and the Mayor's testimony, none of this evidence is comprehensive. If, in fact, a word for word transcript existed, then it would be better evidence than that which is currently available, and its destruction would be prejudicial to the Plaintiffs.

However, there still remains two important determinations to be made. Firstly, did such a transcript actually exist? Secondly, was the city in a position that it knew or should have known that such evidence would be critical to the pending lawsuit. The Court finds the first question dispositive, and therefore need not address the second question. Defendant's counsel, Eric Martin, testified that he looked through his computer files and was unable to locate any written apology that he drafted for the Mayor. Furthermore, Mr. Martin testified that a search of all of the documents from the meeting failed to reveal the transcript of the apology, and that he may have handwritten the notes for the Mayor. Additionally, Plaintiffs have failed to provide any concrete evidence that such a document existed. The Court is unwilling to impose sanctions upon the Defendant on the basis of an assumption. The Court is not holding that the Mayor did not know or should not have known that any documents from statements made during a public meeting should be retained. This is a separate question, and the Court does not reach a conclusion on that legal issue. Rather, the Court holds only that the evidence presented by Plaintiffs is insufficient to support a finding by this Court that a verbatim copy of the statement made by the Mayor existed. Therefore, Plaintiffs' Motion for Sanctions for the spoilation of evidence is denied.

## III.  MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs have filed a motion for summary judgment on the limited basis of issue preclusion. Plaintiffs assert that the ordinance at issue in this lawsuit is substantially similar to the ordinance at issue in a prior state law suit, and therefore Defendant is barred by the doctrine of issue preclusion from litigating the action a second time in this Court. Defendant's motion for summary judgment is considerably broader. Defendant's seek summary judgment in their favor that the ordinance at issue is lawful and enforceable, thereby denying Plaintiffs' Motion for Issuance of a Preliminary and Permanent Injunction.

### A. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986). The United States Supreme Court has noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Id*. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 249. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

**B. PLAINTIFF'S MOTION**

As an initial matter, the Court notes the procedural posture of this motion. Plaintiffs have filed a motion for a Permanent Injunction upon which they seek summary judgment. Their basis for seeking summary judgment is that the issue to be decided by this Court is the same issue that was decided by the state court, and therefore this Court is precluded.

For purposes of this motion, it is helpful to detail the chronology of the ordinance at issue in this action, as well as the ordinance that was at issue in the previous state court action. On July 17, 2007, Ordinance No. 1708 was enacted by the City of Valley Park, entitled "An Ordinance Relating to illegal Immigration within the City of Valley Park, Mo." On September 22, 2006, four plaintiffs filed a lawsuit against the City in *Reynolds*, in St. Louis County Circuit Court. Ordinance No. 1708 was repealed and replaced by Ordinance No. 1715, which was enacted on September 27, 2006. Both Ordinance No. 1708, and Ordinance No. 1715 addressed the hiring of illegal immigrants ("employment provision") as well as the leasing of property to illegal immigrants ("landlord provision"). On February 5, 2007, the City again amended its ordinances, adopting Ordinance No. 1721 and Ordinance No. 1722.[7] Ordinance No. 1721 addresses the landlord provision of the earlier ordinances, and Ordinance No. 1722 addresses the employment provision. At issue in this lawsuit is only Ordinance No. 1722, the employment provision.

The *Reynolds* action challenged the validity of Ordinances No. 1708 and No. 1715; and was not amended to include Ordinances No. 1721 and No. 1722. On March 1, 2007, the circuit court held a hearing to address the question of whether the question of the validity of Ordinances No. 1708 and No. 1715 had been rendered moot by the enactment of Ordinances No. 1721 and No. 1722, and to address the plaintiffs' motion for judgment on the pleadings. On March 12, 2007, the circuit court declared Ordinance No. 1708 and No. 1715 void under state law. Plaintiffs now argue before this Court, that because Ordinance No. 1722 is substantially similar to Ordinances No. 1708 and No. 1715, the circuit court's decision to invalidate the earlier ordinances, precludes this Court from addressing the issue a second time.

---

[7]These ordinances were signed by the Mayor on February 14, 2007.

Issue preclusion, or collateral estoppel, prevents a party from raising an issue that was previously decided against the same party. *State ex rel Johns v. Kays*, 181 S.W.3d 565, 566 (Mo. 2006). There are four factors the Court is to consider: "(1) is the issue in the present case identical to the issue decided in the prior adjudication; (2) was there a judgment on the merits in the prior adjudication; (3) is the party against whom collateral estoppel asserted [sic] the same party or in privity with a party in the prior adjudication; and (4) did the party against whom collateral estoppel is asserted have a full and fair opportunity to litigate the issue in the prior suit." *Id.* The Court recognizes that all four factors must be met in order for collateral estoppel to be applicable, however, as the parties only dispute the first and fourth factors, the Court will focus its discussion on those factors.

The first factor is whether the issue to be decided in this case is identical to the issue decided in *Reynolds*. The first step required to make this determination is to articulate exactly what was decided by the state court. On March 1, 2007, the circuit court held a hearing on whether the enactment of Ordinances No. 1721 and No. 1722 mooted the question of the validity of Ordinances No. 1708 and 1715. The legal standard for determining whether the enactment of a new ordinance moots a legal challenge to a prior ordinance is whether the two ordinances are substantially similar. *See Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1064 (8th Cir. 2004) ("A controversy is not moot if the new statute 'is sufficiently similar to the repealed [statute] that it is permissible to say that the challenged conduct continues." (quoting *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 662-63, n. 3 (1993)) (alterations in original). If the two ordinances, the old and the new, are substantially similar, then the case is not mooted, and a judgment on the merits is appropriate. *Id.* The circuit court concluded that the ordinances were sufficiently similar, and therefore the

substantive issue before it was not mooted.  Furthermore, during the March 1, 2008 hearing, counsel for the defendant City stated that "[t]he employment provisions have not been changed in any of the statutes and I would not represent to the court that there is a substantial change in the employment provision."  *Pls. Statement of Uncontroverted Material Facts*, Ex. I, 14.  However, later in that same proceeding, a slightly different exchange took place between Mr. Martin, counsel for Defendant,[8] and counsel for Plaintiff:

> Q: Mr. Leonatti has said, but I want to make sure you're in agreement, that 1722 dealing with employment is virtually identical to 1715 in terms of regarding employment?
>
> A: There were some amendments made and the amendments included making it prospective only in its application, and I believe an appellate process was set forth.
>
> Q: But the substance is virtually identical?
>
> A: Yes, sir.

*Pls. Statement of Uncontroverted Material Facts*, Ex. I, 49.  On this basis, the circuit court concluded that the case was not moot.  However, in its findings in support of its judgment, to void the Ordinances at issue in *Reynolds*, the circuit court held that Ordinance No. 1708, the original employment provision, was invalid because it conflicted with Missouri Revised Statute § 79.470.[9]  *Pls. Statement of Uncontroverted Material Facts*, Ex. J, 6, ¶¶8-9.  The circuit court

---

[8]Mr. Martin is counsel for the City of Valley Park and represents them in both the case before this Court and the *Reynolds* case.  Mr. Leonatti was retained by the City in the *Reynolds* case, but does not represent the City in the case at bar.

[9]That statutory provision states in full:

For all ordinance violations the board of alderman may impose penalties not exceeding a fine of five hundred dollars and costs, or ninety days' imprisonment, or both the fine and imprisonment.  Where the city and state have a penalty for the same offense, the board shall set the same penalty by ordinance as is set by statute, except that imprisonments, when made under city ordinance, may be in the city prison or workhouse instead of the county jail.

stated: "Ordinance No. 1708 conflicts with Mo.Rev.Stat. § 79.470 in that it provides for a fine of '*not less than* Five Hundred Dollars ($500.00),' and loss of a business permit (or its renewal) for a violation of its provisions." *Pls. Statement of Uncontroverted Material Facts*, Ex. J, 6, ¶9.[10]

The Court notes that there is an important distinction between the standard for determining mootness and the standard for issue preclusion. The state court judge was required to find that the new ordinance, in this case Ordinance No. 1722, was substantially similar to the old ordinance, Ordinance No. 1708. However, this Court is required to determine whether "the issue in the present case [is] identical to the issue decided in the prior adjudication." *Johns*, 181 S.W.3d at 566. This difference is highlighted by plaintiffs' counsel in *Reynolds*, when she stated that: "if a new ordinance affects the same class of people as the old and/or attempts to regulate the same conduct as the old, whether in whole or in part, the case is not moot and a court can declare the validity of the old ordinance." *Pls. Statement of Uncontroverted Material Facts*, Ex. I, 22. Just before that, plaintiffs' counsel had admitted that there were some differences between

---

Mo.Rev.Stat. § 79.470.

[10]Paragraph ten of the circuit court's opinion also addresses the question of business permits. Specifically, that paragraph finds that requiring a business to forgo a business permit for a period of five years violates Missouri law. Paragraph ten states in full:

> Ordinance No. 1715 conflicts with Mo.R.Stat. § 79.470 in that it penalizes a violation of its provisions by suspending existing occupancy permits, refusing the issuance of new occupancy permits, prohibiting the collection of rent or compensation, and by forcing a business to forgo a business permit, or renewal of a business permit, for a period of 'not less than five (5) years.'"

*Pls. Statement of Uncontroverted Material Facts*, Ex. J, 7, ¶10. There is no provision in Ordinance No. 1715 which relates to business permits, this is contained within Ordinance No. 1708. This paragraph does not change the Court's finding in this case. Neither the five hundred dollar monetary penalty, nor the loss of a business license for a period of five years, is present in Ordinance No. 1722.

the new ordinance and the old ordinance, hinging their argument on the fact that the ordinances addressed substantially the same subject matter. *Id.* at Ex. I, 21-22. Specifically, plaintiffs' counsel noted a key distinction between the two statutes: "[n]ow granted, under the old ordinance they were also going to fine them severe monetary penalties . . .." *Id.* at Ex. I, 22. As held by the circuit court judge, Ordinance No. 1708 was invalidated because its penalty provision failed to comply with Missouri law. As admitted by plaintiffs' counsel, the monetary penalty provision is not found in the statute at issue before this Court. Therefore, while the two statutes are substantially similar, such that the plaintiffs in *Reynolds* could overcome a mootness challenge, the issue decided by the state court is not identical to the issues to be decided by this court, sufficient to warrant the application of collateral estoppel.

As the first requirement for a finding of issue preclusion has not been met, namely that the issues before this Court, and the issue before the circuit court are not identical, it is unnecessary for the Court to address the remaining three factors. In *Reynolds*, the circuit court found Ordinances No. 1708 and No. 1715 to be invalid as a violation of state law. The circuit court did not address the validity of Ordinance No. 1722, and therefore the issue of its validity is properly before this Court. Plaintiffs' motion for summary judgment on this basis is denied.

### C. DEFENDANT'S MOTION

The Defendant seeks summary judgment on a more substantive and widespread basis. Defendant seeks summary judgment on all bases claimed by Plaintiffs for invalidating Ordinance No. 1722. Defendant first disputes Plaintiffs' assertion that Ordinance No. 1722 is preempted by Federal Immigration Law. Secondly, Defendant argues that Plaintiffs' Equal Protection Claim is fatally flawed as Plaintiffs lack standing, and they have failed to show a suspect classification, discriminatory purpose or impact, or state action. Thirdly, Defendant challenges Plaintiffs' due

process claim. Lastly, Defendant disputes that the ordinance in question violates Missouri Law regarding the imposition of imprisonment and fines.[11]  The Court will address each of the Defendant's arguments, in turn.

### 1. Preemption

As an initial matter, the Court addresses the Parties' arguments regarding the presumption against preemption.  The Defendant correctly states that there is an "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  However, the Supreme Court in *Medtronic*, emphasized that while this presumption exists in all preemption cases, it is particularly relevant in "those in which Congress has 'legislated a field which the States have traditionally occupied . . ..'"  *Medtronic, Inc.*, 518 U.S. at 485 (quoting *Rice*, 331 U.S. at 230).  The Supreme Court clarified the question of a presumption against preemption in the case of *United States v. Locke*.  529 U.S. 89, 108 (2000).  The Supreme Court stated that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."  *Id.*  In *Locke*, the state law in question involved national and international maritime commerce, an area which the Supreme Court found was traditionally a federal domain, and therefore "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers."  *Id.*  The Supreme Court went on to look at whether there was a conflict between the state and federal laws.  *Id.*  In order to determine whether a presumption against preemption exists, this Court must determine whether the

---

[11]Defendant also disputes that issue preclusion is applicable.  However, this was fully addressed by the Court above, and therefore need not be repeated in this portion of the Court's order.

Ordinance in question involves an area of law traditionally governed by the states, the regulation of business licenses, or an area traditionally governed by the Federal government, immigration. The Supreme Court in *DeCanas*, defined a regulation of immigration as "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." 424 U.S. at 355. The Supreme Court further stated that "states possess broad authority under their police powers to regulate the employment relationship to protect workers within the state." *Id.* at 356. The Ordinance in question does not address the question of who may or may not enter the United States, and therefore the Court concludes that the Ordinance is a regulation on business licenses, an area historically occupied by the states. The rule articulated by the Supreme Court in *Metronic, Inc.*, is applicable, and the Court will apply a presumption against preemption. *See Metronic Inc.*, 518 U.S. at 485.

Before the Court addresses the specific arguments presented regarding preemption, the Court will set forth the general governing law.[12] "Pre-emption may be either express or implied and is compelled whether Congress' command is explicitly stated in the statute's language or impliedly contained in its structure and purpose.'" *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 98 (1992) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). This area of the law is further subdivided into two types of implied preemption: "field pre-

---

[12]The Parties disagree over the appropriate semantics in addressing the subject of preemption. Defendant asserts that there are two types of preemption, whereas Plaintiffs assert that there are three. The Court notes that this distinction is in language only. The law of preemption may be broken into two categories: implied or express, with the former being further broken down into implied field preemption and implied conflict preemption. Or, three different types of preemption may be stated, field, conflict, and express preemption. *See e.g. Madeira v. Affordable Housing Foundation, Inc.*, 469 F.3d 219, 238 (2nd Cir. 2006). Plaintiffs refer to field preemption as constitutional preemption. *See e.g. Jones*, 430 U.S. at 525 ( "In its present posture, this litigation contains no claim that the Constitution alone denies California power to enact the challenged provisions."). The Court will ensure that all arguments are addressed in full.

emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict preemption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade*, 505 U.S. at 98 (internal citations omitted).

### a. Express Preemption

The first argument between the Parties relates to express preemption; specifically, does the federal statute expressly preempt the state law in question? The federal statute states:

> The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing or similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.

8 U.S.C. § 1324a(h)(2). Thus, the local ordinance is preempted, unless it is a "licensing or similar law." The Ordinance in question is entitled: "An Ordinance Repealing Ordinance No. 1715 and Sections One, Two, Three, and four of Ordinance No. 1708 Relating to Illegal Immigration Within the City of Valley Park, MO, Relating to the Employment of Aliens Within the City of Valley Park, MO." *Pls. Statement of Uncontroverted Material Facts*, Ex. H. The key section of the Ordinance is Section Four, which is entitled "Business Permits, Contracts, or Grants." *Id.* This section states:

> A. It is Unlawful for any business entity to recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City. Every business entity that applies for a business license to engage in any type of work in the City shall sign an affidavit, prepared by the City Attorney, affirming that they do not knowingly utilize the services or hire any person who is an unlawful worker.
>
> B. Enforcement: The Valley Park Code Enforcement Office shall enforce the requirements of this section.
>
> > (1) An enforcement action shall be initiated by means of a written signed complaint to the Valley Park Code Enforcement Office submitted by any City

official, business entity, or City resident. A valid complaint shall include an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred.

(2) A complaint which alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced.

(3) Upon receipt of a valid complaint, the Valley Park Code Enforcement Office shall, within three (3) business days, request identify [sic] information from the business entity regarding any persons alleged to be unlawful workers. The Valley Park Code Enforcement Office shall suspend the business permit of any business entity which fails, within three (3) business days after receipt of the request, to provide such information.

(4) The Valley Park Code Enforcement Office shall suspend the business license of any business entity which fails to correct a violation of this section within three (3) business days after notification of the violation by the Valley Park Code Enforcement Office.

(5) In any case in which the alleged unlawful worker is alleged to be an unauthorized alien, the Valley Park Code Enforcement Office shall not suspend the business license of the business entity if prior to the date of the violation the business entity had verified the work authorization of the alleged unlawful worker using the Basic Pilot Program.

(6) The suspension shall terminate one (1) business day after a legal representative of the business entity submits, at a City office designated by the City Attorney, a sworn affidavit stating that the business entity has corrected the violation, as described in Section 5.B.

. . .

(7) For a second or subsequent violation, the Valley Park Code Enforcement Office shall suspend the business permit of a business entity for a period of twenty (20) days. After the end of the suspension period, and upon receipt of the prescribed affidavit, the Valley Park Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate federal enforcement agency, pursuant to Untied States Code Title 8, section 1373. In the case of an unlawful worker disqualified by state law not related to immigration, the Valley Park Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate state enforcement agency.

*Id.*

On its face, the ordinance in question appears to be a licensing law, as it relates to the issuance of business permits, and the denial of business permits. Plaintiffs dispute that the Ordinance falls within the exception, arguing that it would violate the intent of congress to interpret the statute so that a state or local government was forbidden from imposing criminal or civil sanctions, but could "impose the enormous penalty of entirely shuttering a business." *Pls. Memo. in Opp. to Def. Mot. for Summ. Judg.*, 8.[13] The Court agrees with Defendants that whether or not the denial of a business permit is a greater or lesser sanction than fines and imprisonment is an irrelevant inquiry.[14] The question before the Court is not whether the sanctions reserved to the state or local government are greater or lesser than those granted to the federal government, or whether Congress intended such a result; the question for the Court is solely whether the ordinance is a licensing or other similar law. *See Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992).

> [I]n interpreting a statute a court should always turn first to one, cardinal cannon before all others. We have stated time and again that courts must presume that a legislature says what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.

*Id*. at 254 (internal citations omitted). The law in question specifically relates to the issuing of a business permit. The purpose of the law may indeed be, as stated in the title, to address illegal

---

[13]Throughout their briefing, Plaintiffs rely heavily upon the recent Pennsylvania decision, in which a substantially similar local ordinance was found to be preempted by federal law. *See Lozano v. City of Hazleton*, 496 F.Supp.2d 477 (M.D. Penn. 2007). The Court respectfully notes that the Pennsylvania decision is not binding, and therefore, the Court will conduct its own thorough analysis of the issues presented.

[14]The Court also notes that the Ordinance will immediately reinstate a business license upon a showing that the violation has been corrected. Ordinance 1722, § 4B.(6). Upon a the correction of a second or subsequent violation, the business license is suspended for twenty (20) days. Ordinance 1722, § 4B.(7).

immigration within the city of Valley Park, however, licensing laws may have any number of purposes. *See e.g. Gold Cross Ambulance and Transfer v. City of Kansas City*, 705 F.2d 1005, 1013 (8th Cir. 1983) ("[T]he thrust of the licensing law . . . was toward control of destructive competition and improvement of service.").

Plaintiffs also assert that the ordinance in question is not a licensing law because it applies to those required to get a business permit, as well as those who are exempt from obtaining a business permit. The Court finds this argument unpersuasive. The Ordinance in question mimics the requirements of the City's business licensing Ordinance, and places additional requirements on business entities within the City. The Court is weary of finding a law preempted, simply because it is passed as an addition to an existing licensing scheme, rather than as an entirely new licensing law. If Plaintiffs' argument were correct, the Ordinance would be valid if it had invalidated the existing business license requirements, and passed a new law with the additional requirement that employers verify the legal status of all employees. The Court is also unpersuaded that the application of the law to those who are not required to possess a business permit is material. Plaintiffs argument fails, firstly, because IRCA states "licensing or similar law[,]" the law is clearly a similar law as its penalties are limited to the suspension of a business license. 8 U.S.C. § 1324a(h)(2). Secondly, the local ordinance that dictates who is required and who is exempt to the business license requirements effects all business entities, and yet is still clearly a licensing law. It is illogical to assert that a law is not a licensing law because some individuals that would fall within its definitions are exempt for one reason or another. The fact that those exempt from the business license requirement does not effect this Court's determination that the Ordinance at issue is a licensing law.

The Court is in agreement with Defendant that the statutory language is not ambiguous. However, the Court will nonetheless look at the legislative history to ensure that the Court's interpretation of the express preemption provision is correct. *See Garcia v. United States*, 469 U.S. 70, 75 (1984) ("While we now turn to the legislative history as an additional tool of analysis, we do so with the recognition that only the most extraordinary showing of contrary intentions from those data would justify a limitation on the 'plain meaning' of the statutory language."). The specific provision of the legislative history, upon which Plaintiffs rely, states:

> The penalties contained in this legislation are intended to specifically preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment or referral of undocumented aliens. They are not intended to preempt or prevent lawful state or local processes concerning the suspension, revocation or refusal to reissue a license to any person who has been found to have violated the sanctions provisions in this legislation. Further, the Committee does not intend to preempt licensing or 'fitness to do business laws,' such as state farm labor contractor laws or forestry laws, which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens.

H.R. Rep. 99-682(I), at 58 (1986) *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5662. This provision, contrary to the assertions made by Plaintiffs, supports the validity of the Ordinance in question. The house report restates the purpose of the preemption provision, that it is not intended to prevent states from suspending, revoking, refusing to issue, or reissue a license to a person found to have violated the statute. *Id.* Furthermore, the Court notes that in order to overcome the plain meaning of the statute, the legislative history would have to provide an extraordinary showing of contrary intentions. *Garcia*, 469 U.S. at 75. Plaintiffs also rely on this statement in the legislative history as evidence that any penalty linked to a state licensing law can only be imposed after a finding by the federal government that federal immigration law has been violated. *See* H.R. Rep. 99-682(I), at 58. Although the wording in the house report is somewhat ambiguous, the wording of the statute is perfectly clear. A local government is prevented from

imposing any penalty, except through "licensing or similar laws," "upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). There is no requirement in the statute that a finding be made by the federal government that a person has employed, recruited or referred for a fee for employment, unauthorized aliens, only that those are the individuals who are subject to penalty. *Id.* Therefore the ambiguity in the legislative history is irrelevant.[15] The plain meaning of the statute clearly provides for state and local governments to pass licensing laws which touch on the subject of illegal immigration. The statute at issue is such a licensing law, and therefore is not expressly preempted by the federal law.

### b. Implied Preemption[16]

Plaintiffs next assert that even if the Ordinance in question is not covered by the express preemption provision of the federal immigration law, it is impliedly preempted. *Pls. Memo. in Opp. to Def. Mot. for Summ. Judg.*, 9. Plaintiffs allege both field and conflict preemption, however, the majority of their arguments relate to conflict preemption. The Parties raise a number of arguments regarding implied preemption, specifically relating to whether certain provisions of Ordinance No. 1722 conflict with federal law. However, the first question for the

---

[15]The Court also notes that the wording of the Ordinance at issue requires that "[t]he determination of whether an individual is an unauthorized alien shall be made by the federal government, pursuant to United Stats Code Title 8, Subsection 1373(c)." Ordinance No.1722 § 5E. Therefore, even if federal law did require that a finding be made by the federal government, Ordinance No. 1722, by its own times, complies with this requirement. The only circumstance in which the Ordinance would not comply, would be if the Federal Law required that an employer be found to be in violation of the Federal statute before any state action could be taken. However, nowhere in the legislative history cited by Plaintiffs, nor, more importantly, within the language of the statute, is this requirement stated.

[16]The Court notes at the outset that this is a difficult argument for Plaintiffs to make. Not only must they overcome the presumption against preemption, but they must also show that regardless of the express preemption provision which allows licensing laws, Congress intended to preempt certain licensing laws impliedly.

Court to address is whether an analysis of implied preemption is appropriate when there is an express preemption provision.

Plaintiffs argue that it is appropriate to address implied preemption, even when there is an express preemption provision. For support of this proposition they cite to the Supreme Court case of *Sprietsma v. Mercury Marine, a Division of Brunswick Corporation.* 537 U.S. 51 (2002). Plaintiffs are correct that the Supreme Court stated: "Congress' inclusion of an express pre-emption clause "does *not* bar the ordinary working of conflict pre-emption principles, that find implied pre-emption 'where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of full purposes and objectives of Congress." *Sprietsma*, 537 U.S. at 65 (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000)). However, the Supreme Court also stated in that case that "our task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma*, 537 U.S. at 62-63 (internal quotation omitted).

## I. Implied Field Preemption

Having concluded that implied preemption may be found, even in the presence of an express preemption provision, the Court will now address the first category of implied preemption, field preemption. This requires little discussion. Field preemption occurs "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . .." *Gade*, 505 U.S. at 98. In the context of regulations regarding illegal aliens, the Supreme Court made clear in *DeCanas*, that no such blanket intent on the part of Congress existed. 424 U.S. at 357-58.

> Only a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was "'the clear and manifest purpose

of Congress'" would justify that conclusion.  *Florida Lime & Avocado Growers v. Paul*, [373 U.S. 132, 146 (1963)], quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Respondents have not made that demonstration.  They fail to point out, an independent review does not reveal, any specific indication in either the wording or the legislative history of the INA that Congress intended to preclude even harmonious state regulation touching on aliens in general, or the employment of illegal aliens in particular.

*Id*.  (footnote omitted).  The Supreme Court in *DeCanas* made clear that while the "power to regulate immigration is unquestionably exclusively a federal power, . . . the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se preempted by this constitutional power . . .."  424 U.S. at 355.  The Court recognizes that this case was handed down prior to the enactment of IRCA, however, the provision in question in the current statute serves only to bolster the Supreme Court's conclusion.  Including a provision in the statute, as well as comments in the legislative history, allowing some state licensing regulations to exist, clearly conflicts with an intent to preempt the entire field of immigration regulation.  Therefore, the Court concludes that IRCA does not manifest an intent of Congress to occupy the entire field of immigration law.

## ii.  Implied Conflict Preemption

The Court next looks at whether the Ordinance in question is preempted on the basis of implied conflict preemption.  Conflict preemption exists "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Sprietsma*, 537 U.S. at 65 (quoting *Freightliner Corp. v. Myrick*, 513 U.S. 280, 287 (1995)).  The Court will address each in turn.  Plaintiffs argue that the Ordinance in question is invalid because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Pls. Memo. in Opp. to Def. Mot. for Summ. Judg.*, 9 (quoting *DeCanas*, 424 U.S. at

23

363).  Specifically, Plaintiffs dispute Defendant's assertion that they must show the impossibility of simultaneous compliance, but rather that they need only show that the Ordinance prevents the full objectives of Congress being effectuated.  Plaintiffs suggest a number of ways in which Ordinance No. 1722 conflicts with federal law.  The Court will address each, in turn.

Plaintiffs' first argument is that Ordinance No. 1722 requires verification of domestic workers and independent contractors, who are expressly exempted from IRCA. Plaintiffs argue that this creates a conflict because it negates the intent of Congress to exclude these types of employers from compliance.  Defendant disputes any conflict, arguing that these type of workers would not ordinarily be included in the City's definition of an employee, and therefore the local ordinance does not impose upon an employer of a domestic worker, or the company employing an independent contractor, any additional requirements.  Furthermore, Defendant argues that there is no conflict with federal law, because federal law does not prohibit a City from determining the immigration status of a casual domestic laborer or independent contractor.  The Court will address the two groups separately.

The code of federal regulation defines the term employee as "an individual who provides services or labor for an employer for wages or other remuneration but does not mean independent contractors as defined in paragraph (j) of this section or those engaged in casual domestic employment as stated in paragraph (h) of this section . . .."  8 C.F.R. § 274a.1(f).  Section (h) of that regulation states that "the term 'employment' . . . does not include casual employment by individuals who provide domestic service in a private home that is sporadic, irregular or intermittent.  8 C.F.R. § 274a.1(h).  Ordinance No. 1722 states:

> "Business entity" means any person or group of persons performing or engaging in any activity, enterprise, profession, or occupation for gain, benefit, advantage, or livelihood, whether for profit or not for profit.

(1) The term business entity shall include, but not be limited to, self-employed individuals, partnerships, corporations, contractors, and subcontractors.

(2) The term business entity shall include any business entity that possesses a business license, any business entity that is exempt by law from obtaining such a business license, and any business entity that is operating unlawfully without such a business license.

Ordinance No. 1722, § 3A.(1)-(2). With regards to domestic workers, the regulations themselves limit this exception to work done within the home. 8 C.F.R. § 274a.1(h); *see also Jenkins v. I.N.S.*, 108 F.3d 195, 199 (9th Cir. 1997) ("The INS regulation restricted this temporal exception to domestic service in a private home.").

Plaintiffs encourage the Court to find a conflict between the broad application of Ordinance No. 1722 and the limits placed on compliance by the federal statute. As the cited language above shows, the Court finds no such conflict. Firstly, there is nothing in Ordinance No. 1722 which would require an individual who hires a casual domestic worker, for a short period of time, to comply with the Ordinance, other than that in the event that the hirer is informed of the employee's illegal status, they are required to terminate employment.[17] Secondly, the Court notes that it is questionable whether the regulations, offered by Plaintiffs as proof of a conflict, are binding. The Ninth Circuit in *Jenkins*, stated that "we have serious doubts about whether the regulation itself reasonably interprets the statute or the legislative history." *Jenkins*, 108 F.3d at 200.[18] "An interpretation [by an agency] is not entitled to deference if it is contrary to clearly expressed congressional intent." *Id.* The statutory language in this case, unambiguously states

---

[17]The exception referenced in the Federal Regulations, is an exception to the documentation requirements for employers, it does not excuse the continued employment of known undocumented worker. 8 C.F.R. § 274a.1(h).

[18]The Ninth Circuit was reviewing the decision of an ALJ, and therefore it was procedurally improper for that court to question the applicability of the regulation. *Jenkins*, 108 F.3d at 200-201 ("The posture of this case leaves us in an interpretive quandary.").

that the eligibility verification system applies to all employers, without exception. 8 U.S.C. § 1324a(a)(1)(B). Assuming that Plaintiffs are correct, and the regulations quoted above are applicable, the clear statutory language, and the small exception that is created, is not sufficient to create a conflict between Congressional intent and the local ordinance. Again, assuming that Congress intended domestic workers[19] to be excused from the documentation requirements, this does not evidence an intent that no state law touch on these employees. The clear intent of congress is that all employees be subject to the employment requirements, a very limited exception does not provide a basis for finding conflict preemption. The Court concludes that the limited exception in the federal regulation for domestic workers does not create a conflict. The Court also notes that the definition of the term business entity, could be read to exclude domestic workers, as they are not engaged by the employer in order to make a profit, but rather to do minimal household tasks. Regardless of the inclusion of these employees, the Court does not see a conflict between the local and federal law.

The Court also disagrees with Plaintiffs that a conflict is created because of the federal regulation that excludes independent contractors from the documentation requirements. The exclusion is contained in 8 C.F.R. § 274a.1(f), quoted above, and § 274a.1(j) provides a detailed definition of an independent contractor.[20] There is nothing in this definition that prevents an

---

[19]The Court addresses independent contractors separately, as these individuals are not generally included within a definition of employees.

[20]That definition states:

The term independent contractor includes individuals or entities who carry on independent business, contract to do a piece of work according to their own means and methods, and are subject to control only as to results. Whether an individual or entity is an independent contractor, regardless of what the individual or entity calls itself, will be determined on a case-by-case basis. Factors to be considered in that determination include, but are not limited to, whether the individual or entity: supplies

employer from complying with both the local and federal law. *See e.g. Sprietsma*, 537 U.S. at 65 The Ordinance applies to all business entities, which includes contractors. Contractor in turn is defined as "a person, employer, subcontractor or business entity that enters into an agreement to perform any service or work or to provide a certain product in exchange for valuable consideration. This definition shall include, but not be limited to, a subcontractor, contract employee, or a recruiting or staffing entity." Ordinance No. 1722, § 3C. This, by its terms, applies the requirements of the ordinance to a contractor, who hires employees, it does not hold the hirer of the contractor responsible for the employees of that contractor. The Court can find no conflict between compliance with both statutes. The federal government excuses an individual from verifying the work authorization of the employees of an independent contractor, nothing in Ordinance No. 1722 contradicts this. Furthermore, should the Court conclude that Ordinance No. 1722 required a higher level of verification, this would not prevent an individual from complying with both the local and federal law. *See Incalza v. Fendi North America, Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007) ("We find preemption only in 'those situations where conflicts will necessarily arise.' A hypothetical conflict is not a sufficient basis for preemption." (quoting *Goldstein v. California*, 412 U.S. 546, 554 (1973)). Without even a hypothetical conflict between the two laws, this is insufficient to support a finding of preemption. While the Court recognizes Plaintiffs assertion that there need only be a conflict with the purpose of the federal statute, *see Sprietsma*, 537 U.S. at 65, this does not mean that every slight difference in emphasis

_____

the tools or materials; makes services available to the general public; works for a number of clients at the same time; has an opportunity for profit or loss as a result of labor or services provided; invests in the facilities for work; directs the order or sequence in which the work is to be done and determines the hours during which the work is to be done.

8 C.F.R. § 274a.1(j).

between the federal requirements and the local requirements creates such a conflict. The purpose of the federal law is clearly to control the employment of undocumented aliens; the ordinance is aimed at the same conduct.

The next issue raised by Plaintiffs is that the local ordinance fails to prohibit discrimination on the basis of national origin, which is in conflict with IRCA. The plain language of the ordinance belies Plaintiffs' assertion, and therefore little discussion is required. Ordinance No. 1722 states: "A complaint which alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced." Ordinance No. 1722, § 4B.(2). The Court will not assume that the Defendant City intended the statute to be enforced in such a way as to discriminate against individuals on the basis of national origin. The Court does not find any conflict between the Federal statute and the local ordinance on this basis. The Court will more fully address the question of discrimination below, in reference to Plaintiffs' equal protection claim.

Next, Plaintiffs assert that there is a conflict between the process outlined in Ordinance 1722 and the process provided in IRCA, such that preemption is required. This argument is also easily disposed. Plaintiffs argue that under IRCA an individual who receives an adverse finding under the Basic Pilot program is given eight days to contest that finding, followed by a ten day period in which the government may respond. The federal regulations provide that during the contested period, the employer may not take any action, including termination, against the employee. What Plaintiffs describe as an adverse finding is described by the federal regulations as a "tentative nonconfirmation." 62 F.R. 48309-01(IV)(B)(2). The procedure following a tentative nonconfirmation is as follows:

> An employee who is the subject of a tentative nonconfirmation after completion of an automated Service verification check is provided a secondary verification opportunity

to verify his or her employment status. In these cases, the employer must notify the employee of the tentative nonconfirmation and determine whether or not he or she will contest the tentative nonconfirmation. If the employee does not contest the tentative nonconfirmation, it will be considered a final nonconfirmation. If the employee contests the tentative nonconfirmation, he or she must contact the Service within 8 Federal Government work days for resolution of his or her case. The employer will instruct the employee to call a Service toll-free telephone number or visit a local Service office within that time period. The SSA [Social Security Administration] and the Service have 10 Federal Government work days within which to respond to contested tentative nonconfirmation cases. During this period, the employer may not terminate or take adverse action against the employee based upon his or her employment eligibility status, unless the Service determines, within that time, that the employee is not authorized to work.

62 F.R. 48309-01(IV)(B)(a). The Court does not find any conflict between this procedure, and the procedure mandated by the Ordinance. The Ordinance requires that:

> upon the receipt of a valid complaint,[21] the Valley Park Code Enforcement Office shall, within three (3) business days, request identify [sic] information from the business entity regarding any persons alleged to be unlawful workers. The Valley Park Code Enforcement Office shall suspend the business permit of any business entity which fails, with three (3) business days after receipt of the request, to provide such information.

Ordinance No. 1722, § 4B.(3). At first blush this appears to conflict with the federal procedure outlined above. However, the Ordinance allows for the federal procedure to take its course, before the Ordinance has any effect. The Ordinance states:

> If the federal government notifies the City of Valley Park that it is unable to verify whether an individual is authorized to work in the United States, the City of Valley Park shall take no further action on the complaint until a verification from the federal government concerning the status of the individual is received. At no point shall any city official attempt to make an independent determination of any alien's legal status, without verification from the federal government . . ..

Ordinance No. 1722, § 5C. In the event that the Basic Pilot program reports back a tentative nonconfirmation, then the Ordinance's three day time table is tolled, pending completion of the federal determination, which allows the employee eight federal government business days to

---

[21]That is one not based on national origin. Ordinance No. 1722, § 4B.(2).

respond to the nonconfirmation.  There is no conflict between these two provisions such that the employer cannot comply with both.  *Incalza*, 479 F.3d at 1010.  Furthermore, the purpose of both laws is the same, namely to allow the alleged violator an opportunity to correct any error in the determination of an employee's status.

The Court next addresses Plaintiffs' final conflict preemption argument.  Plaintiffs' contend that the Ordinance improperly requires that employers enroll in the BasicPilot program.[22]  Plaintiffs argue that Congress made an informed decision not to require all employers to participate in the BasicPilot program, and that a local law which requires such participation is in conflict with Congressional intent.  Defendant raises a number of arguments in response to this contention.  First, Defendant states that the Ordinance at issue does not require employers to participate in the program, but rather provides a safe harbor for those who have used BasicPilot to verify an employees work eligibility.  Secondly, Defendant argues that even if participation in the program were mandatory, this would not conflict with federal law.

Defendant is correct, that under the Ordinance, employers are not required to participate in the BasicPilot program.  Rather, the Ordinance provides that

> In any case in which the alleged unlawful worker is alleged to be an unauthorized alien, the Valley Park Code Enforcement Office shall not suspend the business license of the business entity if prior to the date of the violation, the business entity had verified the work authorization of the alleged unlawful worker using the BasicPilot Program.

Ordinance No. 1722, § 4B.(5) ("safe harbor provision").  Participation in the program is only mandated "where two or more unlawful workers are verified by the federal government to be

---

[22]This program is alternately referred to as BasicPilot and E-Verify.  At the time the ordinance was drafted the program was known as BasicPilot, it has since been renamed E-Verify. The Court will use the language used in the Ordinance at issue, and that used by the Parties in their briefs, and refer to the program as BasicPilot.

unauthorized aliens . . ..." Ordinance No. 1722, § 4B.(6)(b). Upon such a finding, the Ordinance requires that a business entity's business license shall only be returned if the business entity provides "documentation acceptable to the City Attorney which confirms that the business entity has enrolled in and will participate in the BasicPilot Program for the duration of the validity of the business permit granted to the business entity." *Id.* IRCA provides for the implementation of an employee verification program. 8 U.S.C. § 1324a. An amendment to IRCA, known as the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), provides for the Attorney General[23] to conduct three pilot programs of employment eligibility confirmation. PL 104-208, 1996 HR 3610, 3009-655. IIRIRA further provides that:

> any person or other entity that conducts any hiring (or recruitment or referral) in a State in which a pilot program is operating may elect to participate in that pilot program. Except as specifically provided in subsection (e), the Attorney General may not require any person or other entity to participate in a pilot program.

PL 104-108, 1996 HR 3610, 100 Stat. 3009-656, IIRIRA § 402(a). Subsection (e) requires certain entities to participate in the BasicPilot program. PL 104-108, 1996 HR 3610, 100 Stat. 3009-656, IIRIRA § 402(e). Specifically, all government departments are required to participate, as well as certain violators. PL 104-108, 1996 HR 3610, 100 Stat. 3009-656, IIRIRA § 402(e)(1) & (2).

> An order under section 274A(e)(4) [8 U.S.C. § 1324a(e)(4)] or section 274B(g) [8 U.S.C. § 1324b(g)] of the Immigration and Nationality Act may require the subject of the order to participate in, and comply with the terms of, a pilot program with respect to the subject's hiring (or recruitment or referral) of individuals in a State covered by such a program.

PL 104-108, 1996 HR 3610, 100 Stat. 3009-656, IIRIRA § 402(e).

---

[23]The Secretary of Homeland Security was later substituted for the Attorney General.

The Court does not find any conflict between the provisions of the Ordinance and IRCA (as amended by IIRIRA). Both the Ordinance and the federal law provide for voluntary participation in the BasicPilot Program, unless a business is found to be in violation of either the local ordinance or the federal law, in which case participation becomes mandatory. Furthermore, as evidenced by the numerous statements provided by the Defendant, there has been continued movement towards expanding the BasicPilot program, not limiting it. *See e.g. Def.. Reply Memo. in Support of Def. Mot. for Summ. Judg.*, Ex. A, 2 ("Because of the success of this system [Basic Pilot] and its ability to take the guesswork, or some of the guesswork out of employment document review, we're going to be strengthening and expanding the system and giving it a new name: E-Verify."). While the Secretary of Homeland Security recognized that the system was still voluntary, he emphasized that they will "encourage as many companies as possible to use E-Verify." *Id.* The Court also recognizes that a recent Arizona law, which mandated all Arizona state employers to utilize the BasicPilot program was upheld by the United States District Court for the District of Arizona.[24] *See Arizona Contractors Association v. Napolitano*, 2007 WL 4570303 (D. Ariz. Dec. 21, 2007). The Arizona court concisely stated the relationship between the federal law and a state, or local law.

> The program [BasicPilot] was in an evaluative stage when it was created, and so Congress was leery of mandating its use right away itself. Accordingly, it prohibited the Attorney General from requiring participation in the program. IIRIRA § 402(a), 110 Stat. 3009-656. But that does not necessarily mean that Congress placed the

---

[24]Plaintiffs correctly point out that the procedural posture of the Arizona case is distinct. The plaintiffs in that case were seeking to stay the enforcement of the Arizona law pending appeal of the district court's judgment in favor of defendants. *Arizona Contractors Association*, 2007 WL 4570303, at *1 ("Plaintiffs have appealed the December 7, 2007 judgment dismissing this action without prejudice for lack of a justiciable case or controversy against these Defendants. They now seek an injunction preventing the Defendants from implementing or enforcing the [Act] for the duration of the appeal."). However, the analysis of the Arizona court is nonetheless instructive.

> conduct that it excluded from federal mandate-whether to use E-Verify-also outside
> of the residuum of conduct subject to the police power of the state. A decision not
> to invoke federal coercive powers leaves conduct within the power of the states to
> compel or forbid for proper legislative purposes.

*Id.* at *14. The Court does not see Congress's decision not to make the program mandatory as restricting a state or local government's authority under the police powers. Furthermore, the Court recognizes that generally, a state has concurrent jurisdiction with the federal government to enforce federal laws. *See Gonzales v. City of Peoria*, 722 F.2d 468, 474 (9th Cir. 1983). The Ordinance in question uses the BasicPilot program to determine an individual's work status in the same manner as that proscribed by the Federal Government. This allows for greater enforcement of the federal law, while providing additional local sanctions through the licensing law. There is no conflict between the two laws.

Having thoroughly reviewed each of Plaintiffs' arguments in support of preemption, the Court concludes that Ordinance No. 1722 is not preempted by federal immigration law. The City's Ordinance falls squarely into the exception to preemption carved out by Congress. Furthermore, the emphasis on preventing the hiring of illegal aliens is a goal shared by the Federal and local law.

### 2. Equal Protection

The Court will next address Plaintiffs' equal protection claim. Plaintiffs assert that Ordinance No. 1722 will have the effect of discriminating against individuals of Hispanic origin in violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs sought discovery on the issue of discriminatory impact, and both Parties filed supplemental memorandum following the completion of that discovery.[25] However, Defendant raises two preliminary

---

[25]This Court's order allowing additional discovery was not intended to predetermine the relevance of that evidence. As Defendant correctly states, the factual circumstances surrounding

arguments that need to be addressed, both of which, if correct, would be dispositive of Plaintiffs'

equal protection claim. The first is that Plaintiffs lack standing, the second is that there is no state

action. Plaintiffs allege two ways in which Ordinance No. 1722 will have a discriminatory effect,

in violation of the equal protection clause: "(1) by inducing employers to refrain from employing

Hispanics; and (2) by inducing City officials or Valley Park residents to file complaints under the

Ordinance against business entities based on their employment of Hispanics." *Pls. Memo. in

Opposition to Def. Mot. for Summ. Judg.*, 17.[26]

As an initial matter, the Court will recite the requirements of an equal protection claim.

The Fourteenth Amendment provides that:

> No State shall make or enforce any law which shall abridge the privileges or
> immunities of citizens of the United States; nor shall any State deprive any person of
> life, liberty, or property, without due process of law; nor deny to any person within
> its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1. The "Equal Protection Clause directs that 'all persons similarly

circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (quoting *F.S.*

---

the enactment of the Ordinance is only relevant if the threshold requirements of standing and state
action are satisfied.

[26]It is undisputed that up until this point in time, no action has been taken to enforce the
ordinance against any individuals or businesses. There is some confusion throughout the Parties'
briefs regarding the nature of the Equal Protection Claim asserted, and to what degree
discriminatory motive on the part of the Board of Alderman and the Mayor is relevant to this
claim. There are two types of discrimination claims that can be brought under the Equal
Protection Clause; Plaintiffs may assert that the Ordinance was enacted due to discriminatory
intent on the part of the law makers, or Plaintiffs may assert that the Ordinance has a
discriminatory impact. The second basis, that the Ordinance has a discriminatory impact, can
further be broken down into a facial challenge, or an as applied challenge. There is no basis for an
"as applied" challenge in the case at bar, because no enforcement of the Ordinance has taken
place. However, Plaintiffs assert that the Ordinance has a discriminatory impact on its face, and
alternately that the Ordinance was passed with discriminatory intent. The Court notes that both
equal protection claims require a showing that Plaintiffs possess standing. The state action
argument applies only to Plaintiffs' facial discriminatory impact claim.

*Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Implicit in this dictate is the requirement that legislatures make distinctions between those who are not similarly circumstanced. *Plyler*, 457 U.S. at 216.

> A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

*Id.* The Supreme Court has required a higher standard than the fair relationship test articulated above, if the classification disadvantages a "suspect class," or impinges upon the exercise of a "fundamental right." *Id.* at 216-217. "With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling government interest." *Id.* at 217.[27] If necessary following the Court's analysis of standing and state action, the Court will address the level of scrutiny appropriate in this case.

### a. Standing

The Supreme Court has divided the question of standing into constitutional requirements and prudential considerations. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> The irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of

---

[27]The Supreme Court has also employed intermediate scrutiny for those classifications which are "not facially invidious, [but] nonetheless give rise to recurring constitutional difficulties . . . ." *Plyler*, 475 U.S. at 217. This intermediate level of scrutiny is not alleged by either Party to apply to the case at bar, and therefore, the Court need not address it in further detail.

some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal quotations omitted).  The Supreme Court further held that "[t]he party invoking federal jurisdiction bears the burden of establishing these elements."  *Id.* at 561.  Each element of the standing requirement "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation."  *Id.*  The Supreme Court specifically states that at the summary judgment stage "the plaintiff can no longer rest on 'mere allegations' but must 'set forth' by affidavit or other evidence 'specific facts'" which support a finding of standing.  *Id.* (quoting Fed. R. Civ. P. 56(e)).  The Supreme Court has also placed several "judicially self-imposed limits on the exercise of federal jurisdiction" that have become part of the standing doctrine.  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  For example, "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  *Id.*  Each of these requirements must be satisfied before the Court can proceed to address the merits of Plaintiffs' equal protection claim.[28]

The first constitutional requirement for standing is that Plaintiff present evidence of an injury in fact, which must be both particularized and actual or imminent.  *Lujan*, 505 U.S. at 560.  Defendant disputes that this requirement has been satisfied, arguing that the injury asserted by Plaintiffs is discrimination against third parties, namely Hispanics who are the subject of Plaintiffs' Equal Protection claim.  Plaintiffs dispute this characterization of the injury, arguing that the

---

[28]While the Constitutional requirements are unalterable, the prudential requirements articulated above, may, in certain circumstances, be altered.

injury is the burden of compliance with the statute. Plaintiffs are asserting that the Ordinance in question violates the equal protection clause of the constitution, by improperly discriminating on the basis of national origin. Thus the injury, for purposes of this claim, is to an individual applicant who is not hired on the basis of his national origin, or an employee against whom a complaint is filed. Plaintiffs' assertion that compliance with the Ordinance places a burden upon them sufficient to constitute an injury is inadequate. Firstly, the Court notes that compliance with any statute, law, or ordinance, places some cost of compliance upon the subject of the law. Secondly, standing requires that there be a causal connection between the injury and the conduct of which a complaint is made. *Lujan*, 504 U.S. at 560-561. The conduct challenged by the Plaintiffs is the potential discrimination against employees, or potential employees, of Hispanic Origin. The burden of compliance with the Ordinance is not causally connected to discrimination against individual employees. Therefore the second constitutional standing requirement is not met. This failure to satisfy the constitutional requirements is dispositive of Plaintiffs equal protection claim, however, for purposes of thoroughness, the Court will address Plaintiffs' assertion that they have third party standing.

Plaintiffs argue that their injury, the burden of compliance, is sufficient to satisfy the standing requirement, and that they are able to assert the rights of a third party, in this case the potential employees who will be discriminated against as a result of the Ordinance. The assertion of the rights of a third party is not a limitation on jurisdiction required by the Constitution, but rather is a self-imposed limitation, "designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig v. Boren*, 429 U.S. 190, 193 (1976). In a later Supreme Court case, the Court articulated a three

part test to determine whether an exception to the general prohibition against third-party standing was warranted.

> We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury-in-fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, [*Singleton v. Wulff*, 428 U.S. 106, 112 (1976)]; the litigant must have a close relation to the third party, *id.*, at 112; and there must exist some hindrance to the third party's ability to protect his or her own interests. *Id.*, at 115-116.

*Powers v. Ohio*, 499 U.S. 400, 410-411 (1991). In the case before the Court, Plaintiffs' arguments in support of these requirements are not persuasive. The first requirement, injury-in-fact has been addressed at length, and need not be repeated. The second requirement, is that there be a close relationship between the Plaintiffs and the third party. The specific facts in *Powers*, involved a defendant and a jury person. 499 U.S. at 413. The Supreme Court also noted other close relationships that would satisfy the second requirement: Planned Parenthood official and a licensed physician and rights of contraceptive users with whom they had professional relationships; licensed beer vendor and male customer; attorney and client. *Id.* The relationship of employer and employee may be sufficiently close that an employer has an incentive to litigate on behalf of its employees. However, the case here does not involve an employer and employee relationship, it involves a potential employer and employee relationship. In each of the cases cited by the Parties, and reviewed by the Court, there was an actual third party who was the subject of the constitutional violation. The Court does not believe that this is a sufficient relationship to satisfy the second requirement articulated by *Powers*. 499 U.S. at 411. The third requirement poses the biggest hurdle for Plaintiffs to overcome. Plaintiffs must show that the third-party is unable to bring an action on their own behalf. *Id.* In *Powers*, this requirement was satisfied because the jury person who is eliminated on the basis of race, has little opportunity to raise an

objection before the trial court, and any relief after the fact would be ineffective. *Id.* at 414-415. The present case does not present such hurdles. Plaintiffs assert that a Hispanic employee would be unlikely to raise an equal protection challenge on their own behalf. However, the Court is not persuaded that this is correct. Assuming that the potential employee was a legal worker, was discriminated against on the basis of his or her national origin, and not his or her employment status, there is nothing to prevent that individual from filing a lawsuit on their own behalf.[29]

Plaintiffs rely heavily on the *Craig* case to support their position that they may assert the rights of potential Hispanic employees. However, the Court notes a number of significant differences between the two cases. First, the Supreme Court emphasized the fact that the defendant in *Craig* did not challenge the ability of the Supreme Court, or the lower courts, to address the constitutionality of the state's liquor law. *Id.* at 193. Secondly, and more importantly, the Court notes that the controversy in *Craig* was well defined and was far from speculative. *Id.* The issue before the Supreme Court was whether a liquor law which limited the sale of 3.2% beer to men under 21 and women under 18 violated the Equal Protection Clause. *Id.* at 192. There was no speculation regarding the potential injury to third parties; men under age 21 were not permitted to purchase 3.2% beer, whereas women were. *Id.* The present case involves the potential discrimination by employers against Hispanic workers, or in the alternative, the discrimination against Hispanic workers by citizens of the City in filing complaints. Neither one of these asserted third party injuries is well defined, and both are speculative. Upon enforcement of the statute, if Plaintiffs can show particularized injuries to third parties, who are unable to bring

---

[29]The Cost of litigation is certainly a consideration, however such costs are associated with all suits. Furthermore, the Court notes that the Plaintiffs in the present case are represented by several private attorneys, as well as the American Civil Liberties Union, suggesting that finding competent representation is not a barrier to filing suit.

an equal protection challenge on their own behalf, then the standing discussion may have a different result.  However, on the facts as presented before this Court, in the context of a facial attack, Plaintiffs do not have standing to raise an equal protection claim on behalf of potential employees.

Plaintiffs briefly raise the argument of associational standing.  The Supreme Court has "recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).  This basis for standing requires no further analysis, as Plaintiffs are not an association bringing suit on behalf of its members, rather Plaintiffs are employers attempting to file suit on behalf of potential employees.  Therefore, no associational standing exists in the case at bar.

## b.  State Action

Defendant argues that even if Plaintiffs did have standing to raise an equal protection challenge, such a challenge would fail because of a lack of state action.  Defendant argues that any discrimination that would take place would be on the basis of the individual actor's own biases, and not because of the Ordinance.  Plaintiffs disagree, arguing that the Ordinance itself will cause the unlawful action by third parties, thus making their actions the actions of the City.  There are two key provisions in the Ordinance which form the basis for both Parties' arguments.  The first is the provision which permits complaints to be filed by members of the community.  Ordinance No. 1722, § 4B.(1).  The second, is the Ordinance provision which states that "a complaint which

alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced."  Ordinance No. 1722, § 4B.(2).

The Fourteenth Amendment prohibits discriminatory action "'that may fairly be said to be that of the States.'"  *Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188, 196 (2003) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).  "That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."  *Blum*, 457 U.S. at 1002 (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948)).  "Faithful adherence to the 'state action' requirement of the Fourteenth Amendment requires careful attention to the gravamen of the plaintiff's complaint."  *Blum*, 457 U.S. at 1003.  "To ascertain whether there is state action in a case, we examine the record to determine 'whether the conduct at issue is fairly attributable to the state.'"  *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) (quoting *Montano v. Hedgepeth*, 120 F.3d 844, 848-849 (8th Ci. 1997)).  "We are guided in this inquiry by two additional queries: whether the claimed deprivation 'resulted from the exercise of a right or privilege having its source in state authority' and whether the party engaging in the deprivation 'may appropriately characterized as [a] state actor[].'"  *Wickersham*, 481 F.3d at 597 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)) (alterations in original).

In determining whether the conduct at issue, in this case the discrimination by potential employers and town residents against individuals on the basis of their national origin, is attributable to the City, the Court examines the two queries quoted by the Eighth Circuit. *Wickersham*, 481 F.3d at 597.  The first requirement is that "the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority . . .."  *Id.*  This requirement is not met in the present case.  The Ordinance at issue does not permit an employer to discriminate against potential employees on the basis of national origin.  The only authority

granted to employers under the Ordinance, is the authority to refuse to hire an individual who fails

to provide the documentation, required by Federal law, showing employment status. The

Ordinance in no way authorizes an individual employer to discriminate on the basis of national

origin, and therefore this conduct cannot be attributed to the State, or in this case the local City.

Plaintiffs' alternate theory, that the Ordinance provides the basis for individual discrimination on

the basis of national origin through the Ordinances complaint procedure, also fails to meet this

requirement. The Ordinance explicitly invalidates any complaints that are made on this basis

alone; this can hardly be said to be the basis of the right or privilege to discriminate. Furthermore,

a complaint procedure in and of itself does not violate the equal protection clause.[30] Plaintiffs also

fail to meet the second requirement articulated by the Eighth Circuit; "the party engaging in the

deprivation may be appropriately characterized as a state actor." *Id.* (internal quotation and

alterations omitted). The individuals in question would be either employers, or City residents.

The fact that a local law requires that employers comply with Federal documentation

requirements, or suffer penalties, does not make those employers state actors. Nor are City

residents acting as state actors in filing complaints against business entities that hire illegal

workers. It cannot be said that "the government [is] so entangled in private conduct that the deed

of an ostensibly private organization or individual is to be treated as if a State had caused it to be

performed." *Id.* (internal quotation omitted). The Ordinance in question causes action on the

part of employers and residents, but it cannot be said to cause the action which would result in

discrimination.

Plaintiffs cite to a number of cases in which the Supreme Court held that a state or local

law encouraged conduct which violated the United States Constitution, and therefore the private

---

[30]The federal law provides a similar procedure, which Plaintiffs do not challenge.

42

conduct was found to be state action.  Plaintiffs cite to the case of *Robinson v. State of Florida*, in which the Supreme Court found that a Florida law requiring separate toilet and lavatory facilities for African Americans and whites was sufficient state involvement in the illegal action of private restaurants refusing to serve both races, as it places "burdens upon any restaurant which serves both races, burdens bound to discourage the serving of the two races together."  378 U.S. 153, 156 (1964).  While the Supreme Court did not require the illegal action to be written into the statute in *Robinson*, the relationship between the illegal conduct and the requirements of the statute was very close.  *Id.*  Such a close relationship is not present in the case at bar.  There is a burden related to the imposition of the statute, however, that burden does not encourage employers to refuse to hire Hispanics as suggested by Plaintiffs.  The Court also notes that this alleged burden, is already mandated under Federal law.  Plaintiffs also cite to the case of *Reitman v. Mulkey*, in which the Supreme Court held that a California law which was "intended to authorize, and does authorize racial discrimination in the housing market" was unconstitutional. 387 U.S. 369, 380 (1967).  Part of the basis for the Supreme Court's decision in that case, was that prior to passing the law at issue, the California state legislature had repealed an existing law forbidding private racial discrimination.  *Id.* at 381.  The Supreme Court viewed this as evidence of the legislatures intent to permit racial discrimination in the housing market.  *Id*.  Again, this case is distinct from the present case, as the Supreme Court clearly focused on the intent of the legislature to allow private discrimination, thus constituting state action.  *Id.*  The Ordinance in question in no way authorizes individuals to discriminate against Hispanics, and in fact specifically warns against the validity of such conduct.  Therefore, any potential discrimination that results in the hiring of employees, or in the filing of complaints, cannot fairly be construed as being caused by State action.

### c. Merits

As the Court has found that Plaintiffs lack standing, and alternately that the claimed discriminatory action lacks state action, it is unnecessary to address the merits of Plaintiffs' equal protection claim.  However, to ensure that all issues are fully addressed, the Court will briefly touch on the merits of Plaintiffs' claim.  This requires a brief discussion of both Plaintiffs' facial challenge asserting that the Ordinance has a discriminatory impact, and Plaintiffs' assertion that the Ordinance was passed with a discriminatory intent.   The first question to be determined is what classification is being challenged, upon making such a determination, the Court then applies the appropriate test to determine whether the challenged conduct violates the Equal Protection Clause.

Plaintiffs characterize the Ordinance at issue as one which classifies individuals on the basis of national origin, which would require analysis under the strict scrutiny test.  Conversely, Defendant argues that the Ordinance classifies individuals on the basis of immigration status, and thus requires application of the rational basis test.  *See Plyler*, 457 U.S. at 223 ("Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'").  The Ordinance in question classifies workers on the basis of immigration status, that is whether they are legally permitted to work in the United States.  Such a classification does not require strict scrutiny by this Court, but rather the City need only show that there is a rational basis between the Ordinance and the purpose for which it was passed.  *Id.*  The City specifically states in the second section of the Ordinance that "illegal immigration leads to higher crime rates, subjects our hospitals to fiscal hardship and our residents to substandard quality of care, contributes to other burdens on public services, increasing their costs and diminishing their availability, diminishes our overall quality of life, and endangers the

security and safety of the homeland." Ordinance No. 1722, § 1C. The Court recognizes that such a finding of purpose would fall into a different analysis under strict scrutiny, required in the context of a suspect classification, however, the rational basis standard requires far less analysis. *Plyler*, 457 U.S. at 224; *see also Pennell v. City of San Hose*, 485 U.S. 1, (1988) ("[W]e will not overturn a statute that does not burden a suspect class or a fundamental interest unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." (internal quotation omitted)). The Court in *Plyler*, also stated that "the States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal." *Id.* at 225. On its face, Ordinance No. 1722 does not violate the Equal Protection Clause of the Fourteenth Amendment.

The majority of the evidence submitted by Plaintiffs is in support of their claim that the Ordinance in question was intended to discriminate against Hispanics. In support of this assertion, Plaintiffs point to evidence of comments made by the Mayor, and subsequently reported in a local newspaper article, as well as materials circulated to the Board of Alderman prior to the passage of the Ordinance at issue. Defendant disputes that this information is sufficient to support a finding of discriminatory intent.

The Supreme Court in *Rogers v. Lodge*, held that a legislative scheme that is not on its face unconstitutional, may violate the Fourteenth Amendment "if 'conceived or operated as purposeful devices to further racial discrimination' . . .." 458 U.S. 613, 617 (1982) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971). The Supreme Court in *Whitcomb* stated that "the courts have been vigilant in scrutinizing schemes allegedly conceived or operated as purposeful devices to further racial discrimination." 403 U.S. at 149. The Court notes that there

can be no claim that the Ordinance operates to discriminate, as it has yet to be enforced, but the Court will review the claim that it was conceived as a "purposeful device[] to further racial discrimination." *Id.* A court addressing the question of the validity of an Ordinance, "must keep in mind the fundamental principal that 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact . . .. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.'" *Hernandez v. New York*, 500 U.S. 352, 359-360 (1991) (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-265 (1977)). "Discriminatory purpose implies more than intent as volition or intent as awareness or consequences. It implies that the decisionmaker selected a particular course of action it least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Hernandez*, 500 U.S. at 360 (internal alterations and citations omitted).

The Court must decide whether Plaintiffs have presented evidence, sufficient to show a genuine issue of material fact. The Court finds that Plaintiffs fail to meet this standard. As an initial matter, the Court notes that Plaintiffs must show discriminatory intent by the Alderman, and not only by the Mayor. Even assuming that the City was aware that the Ordinance would disproportionately effect Hispanic applicants, and assuming that such a negative impact results,[31] there is no evidence that the Ordinance was passed because of this negative impact. The testimony of each of the Board of Aldermen belies this assertion. Each one testified to their reasons for passing the Ordinance, and each reason related to the impact of illegal workers on the job market, the strain on the local economy because of illegal immigrants, and the impact on other

---

[31]The Court notes that if the Ordinance is enforced as written, there will be no discrimination against Hispanics. The only classification in the statute is on the basis of work eligibility.

local services.  While the Court recognizes that personal statements made by legislatures are relevant to a determination of intent, *Arlington Heights*, 429 U.S. at 268, the only evidence of that in this case involves the Mayor, and not the Aldermen.  Plaintiffs point to the lack of discussion during the meeting at which the Ordinance was passed, as evidence supporting their decision.  However, this lack of discussion forces the Court to look more directly at the terms of the Ordinance, and the testimony of the Aldermen in their depositions.  The Ordinance itself provides the reason for its passage, and each statement by the Aldermen support this purpose.  The Court concludes that the evidence provided by Plaintiffs, even were the Plaintiffs able to meet the standing requirements, is insufficient to support a jury verdict in their favor on the question of discriminatory intent.

### 3. Due Process

Plaintiffs assert that the Ordinance violates the due process clause because it subjects Plaintiffs to the potential deprivation of their businesses without providing standards or guidance for compliance, it does not provide for pre-sanction hearing, and provides no meaningful process or procedure by which Plaintiffs might challenge Defendant's determination that Plaintiffs have violated the ordinance.  *Pls. Response in Opposition to Def. Mot. for Summ. Judg.*, 29.  Defendant disputes Plaintiffs' factual assertions, as well as their legal conclusion that the process provided is insufficient.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  "For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must

first be noticed." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). It is undisputed that "some form of hearing is required before an individual is finally deprived of a property interest." *Mathews*, 424 U.S. at 333. It is also undisputed that a business license constitutes a property interest. *See Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without procedural due process required by the Fourteenth Amendment."); *see also Tanasse v. City of St. George*, 1999 WL 74020, *2 (10th Cir. February 17, 1999). Plaintiffs' argument centers on the requirement of a pre-deprivation hearing. However, the Supreme Court in *Mathews*, held that "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The Supreme Court in *Mathews* held that there are three distinct factors to consider in identifying the specific dictates of due process: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 334-35. The Supreme Court has further made clear that determining what process is required "is influenced by the extent to which he [the recipient of the procedure] may be condemned to suffer a grievous loss . . .." *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970).

Plaintiffs' first argument is easily disposed. Plaintiffs assert that the ordinance fails to provide notice of how to comply. The text of the Ordinance itself belies this assertion. The Ordinance requires that "[i]t is unlawful for any business entity to recruit, hire for employment, or

continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or in part within the city." Ordinance No. 1722, § 4A. Clearly a business is on notice that if it hires an unlawful worker, then it will be in violation of the code. Furthermore, the Ordinance requires that when applying for a business license, that person "shall sign an affidavit, prepared by the City Attorney, affirming that they do not knowingly utilize the services or hire any person who is an unlawful worker." Ordinance No. 1722, § 4A. The Court will not repeat the remaining provisions in full, as they are cited above. However, the Court notes that the Ordinance goes on to state how the statute will be enforced, and how a business that is found to be in violation of the Ordinance should proceed. Ordinance No. 1722, § 4B. The Court finds nothing confusing about these provisions, and therefore, concludes that Plaintiffs have sufficient notice as to how to comply. Plaintiffs also argue that the Ordinance gives no guidance on how a business entity is to determine the work status of an individual employee. Plaintiffs are correct that the Ordinance does not specifically provide information on how to determine the status of an employee. However, it does encourage the use of the BasicPilot program, which can be used to determine an individuals work status. Furthermore, all employers are required to determine the work status of an employee under Federal law, therefore, the Court does not see this as a valid complaint by the Plaintiffs. Plaintiffs further argue that only an immigration judge can make a final determination regarding the lawful status of any alien. *Pls. Memo. in Opposition to Def. Mot. for Summ. Judg.*, 30 (citing 8 U.S.C. § 1229a(a)(3)). Plaintiffs are correct in this statement, however, nowhere in the Ordinance are Plaintiffs required to make an absolute determination regarding a worker's status. Plaintiffs are required to refrain from knowingly hiring an unlawful worker, and upon the filing of a valid complaint, they are required to show documentation for the accused unlawful worker. No deprivation of business license takes place

until after the worker is in fact found to be unlawful, a determination made by the federal government. Furthermore, such deprivation is immediately remedied upon action taken by the business entity to correct the violation. Ordinance No. 1722, § 4B.(6).

Plaintiffs' next argument requires further discussion. Plaintiffs assert that the Ordinance fails to provide sufficient process before depriving a business of its business license.[32] The key question presented by the Parties, is whether a pre-deprivation hearing is required, and if so, does the Ordinance satisfy this obligation? The Court begins by looking at the predeprivation process that is provided in the Ordinance. The ordinance provisions at issue state:

> (3) Upon receipt of a valid complaint, the Valley Park Code Enforcement Office shall, within three (3) business days, request identify [sic] information from the business entity regarding any persons alleged to be unlawful workers. The Valley Park Code Enforcement Office shall suspend the business permit of any business entity which fails, within three (3) business days after receipt of the request, to provide such information.

> (4) The Valley Park Code Enforcement Office shall suspend the business license of any business entity which fails to correct a violation of this section within three (3) business days after notification of the violation by the Valley Park Code Enforcement Office.

Ordinance No. 1722, § 4B.(3) & (4). The Ordinance also provides for a tolling of the three day period if "[t]he business entity, after acquiring additional information from the worker, requests a secondary or additional verification by the federal government of the worker's authorization . . .." Ordinance No. 1722, § 5B.(2). Thus, the Court reads the Ordinance to provide a business entity three days to present any documentation that it received from the worker regarding the worker's

---

[32]Plaintiffs refer generally to the denial of a business license, or in even more extreme terms the loss of a business. However, the language of the Ordinance, quoted previously by the Court, does not mandate the permanent denial of a business license. The license is immediately reinstated one day after a violation is corrected. In the event of multiple violations, the City is authorized to suspend a business license for twenty (20) days. Ordinance No. 1722, § 4B.(7). The Ordinance does not speak of a permanent loss of a business.

employment eligibility.  Furthermore, the business entity, upon providing the city with such documentation, may request that a verification be made from the federal government through the BasicPilot program.  While this process is taking place, no suspension of the business license takes place.  Plaintiffs point out that the business entity is not given an opportunity to review the contents of the complaint.  The Court does not find that this is required to satisfy due process.

Plaintiffs cite the Court to the case of *Stauch v. City of Columbia Heights*, in which the Eighth Circuit held that "the City was required to provide the Stauches [plaintiffs] with some form of notice and opportunity for a hearing before determining they were no longer licensed."  212 F.3d 425, 431 (8th Cir. 2000).  However, the Eighth Circuit further held that a procedure by which the plaintiffs could appeal a finding of building code violations which would result in the withdrawal of a rental license was adequate process.  *Id.* ("The Stauches concede that the Code's procedure for appealing compliance orders provides adequate due process . . ..").  The process outlined in *Stauch* as sufficient, is analogous to this case.  Plaintiffs in that case were told of a violation, and had a certain period of time to appeal that finding of a violation.  *Id.*  The failure to do so resulted in the loss of a rental license.  *Id.*  In this case, upon a finding by the City that a valid complaint has been made, the alleged violator is given three days to provide documentation of an employee's work status.[33]  The issue before the Eighth Circuit in *Stauch*, was whether the City followed the procedure outlined in the code.  *Id.*  Plaintiffs argue that the contents of the complaint, and the motivation for its filing are significant to the subject of due process.  The Court does not agree.  Given that Plaintiffs, or any employer, are given a three day period before

---

[33]Contrary to Plaintiffs assertion, this does not have to be evidence sufficient to make a final determination of the worker's employment eligibility, but rather must show that the employer sought verification of the employees status.  Such evidence would show that the employer was not knowingly employing an unauthorized worker.

any adverse action is taken, Plaintiffs may easily refute any complaints which are based upon vindictive motives.  Furthermore, the only information which is relevant, is the employment status of the business entities employees.  The information contained within the complaint is not necessary for an alleged violator to refute the claims.[34]  The Court finds that in accordance with the Eighth Circuit in *Stauch*, the Ordinance provides sufficient pre-deprivation notice and opportunity to be heard to satisfy the requirements of due process.  This is in accordance with the three factors articulated by the Supreme Court in *Mathews*.  424 U.S. at 334-35.  The private interest in the present case is the suspension of a business entity's business license.  The Court recognizes that this may be severe, however, this sanction is moderated by the immediate reinstatement of the license following the remedy of an initial violation, and the reinstatement after twenty (20) days following the remedy of a second or subsequent violation.  Ordinance No. 1722, § 4B.(6) & (7).  Furthermore, the procedures provided for leave little room for an erroneous violation.  An individual either is or is not authorized to work in the United States.  Under the Ordinance, a request is made of the federal government to verify an individuals status.  If no violation has occurred, then no further action is taken.  Finally, the Court recognizes the City's interest in compliance with its local ordinances though its business licensing laws, and its further interest, as stated in detail in the Ordinance, in limiting the employment of individuals not

---

[34]Plaintiffs cite *Division of Family Services v. Cade*, to support their contrary conclusion. However, that case involved the suspension of an employee pending an investigation based on alleged sexual harassment.  939 S.W.2d 546, 551 (Mo.Ct.App. 1997).  The Missouri Court of Appeals found that the employee must be given notice of the allegations against him.  *Id.*  This case is clearly inapposite.  Firstly, the Ordinance at issue gives notice of the alleged misconduct, because a violation of Ordinance No. 1722 necessarily involves the hiring of unauthorized workers.  Secondly, in *Cade*, the court of appeals cited to a Missouri statute, which required "that in the case of any suspension over five days in length, an employee so requesting *shall* be furnished with a copy of 'a statement in writing *specifically setting forth the reason for such suspension*.'" 939 S.W.2d at 551 (quoting Mo.Rev.Stat. § 36.270) (emphasis in original).  No such similar statute is present in the case at bar.

authorized to work in the United States. *See* Ordinance No. 1722, § 2. The pre-deprivation procedure provided is in line with the factors articulated in *Mathews*, and fairly balances the interests of the government with the potential wrongful deprivation of a business entity's business license.

The Court next considers Plaintiffs assertion that the post-deprivation process is insufficient. Having found that the pre-deprivation process was sufficient, it is not clear that any further analysis is required. However, both parties present arguments on the sufficiency or lack thereof, of the Ordinance's post-deprivation process, and therefore the Court will briefly address it. As recognized by Plaintiffs, the Ordinance permits appeal to the City's Board of Adjustment. Ordinance No. 1722, § 5E. This provision further provides for appeal from the Board of Adjustment to the St. Louis County Circuit Court. Plaintiffs contend that this reference alone is insufficient to satisfy the constitutional requirements, because it does not detail "what procedures will be afforded as part of a challenge, the standards for reviewing a challenge and the criteria for sustaining or rejecting the challenge." *Pls. Memo. in Opposition to Def. Mot. for Summ. Judg.*, 36. Plaintiffs proposed requirements are higher than those mandated by the due process clause. Plaintiffs cite to the case of *Martinez v. Ibarra*, where a Colorado district court judge held that a Minnesota regulation which failed to articulate "clear, written standards" for its review procedures failed to comply with due process. 759 F.Supp. 664, 668 (D.Colo. 1991). However, that case is not analogous to the present case. The Ordinance at issue clearly delineates the requirements placed upon a business entity, and further articulates the process by which a business entity may challenge a finding of a violation by the City. While the Ordinance does not state every detail, this is not the requirement the Colorado court had in mind, and is not what is required by due process. "[T]he fundamental requirement of due process is the opportunity to be heard 'at a

meaningful time and in a meaningful manner.'"  424 U.S. at 333 (quoting *Armstrong v. Manzo*,

380 U.S. 545, 552 (1965)).  The Ordinance complies with this requirement.

### 4. Violation of Missouri Law

Plaintiffs final assertion is that the Ordinance violates Missouri law, because it imposes the

sanction of revocation of a business license in excess of the authority granted a fourth class city.

Plaintiffs assert that Ordinance No. 1722 violates Missouri law because: "(1) it is not a licensing

law, and yet imposes revocation of a business license as a sanction, and (2) it does not provide for

due process prior to the revocation of a license."  *Pls. Memo. in Opposition to Def. Mot. for

Summ. Judg.*, 36-37.  The Second assertion requires no further discussion.  The Court has

conclusively decided the procedural due process question, and Plaintiffs have cited to no

provision of Missouri Law which imposes more stringent procedural requirements on a City, in

excess of those mandated by the due process clause of the United States Constitution.

The Plaintiffs main argument is that the suspension of business license may only be

imposed in conjunction with the violation of a business licensing law.  The Parties disagree over

whether the Ordinance in question is a licensing law or not.  The Court has previously addressed

this question in the context of preemption.  The Ordinance in question requires business entities to

comply with the Ordinance's obligations as a condition precedent to the receipt of, or continued

possession of a business license.  This is clearly a licensing law.  Missouri law states that:

> The mayor and board of aldermen shall have power and authority to regulate and to
> license and to levy and collect a license tax on auctioneers, druggists, hawkers,
> peddlers, banks, brokers, pawnbrokers, merchants of all kinds, grocers, confectioners,
> restaurants, butchers, taverns, hotels, public boardinghouses, billiard and pool tables
> and other tables, bowling alleys, lumber dealers, real estate agents, loan companies,
> loan agents, public buildings, public halls, opera houses, concerts, photographers, bill
> posters, artists, agents, porters, public lecturers, public meetings, circuses and shows,
> for parades and exhibitions, moving picture shows, horse or cattle dealers, patent right
> dealers, stockyards, inspectors, gaugers, mercantile agents, gas companies, insurance
> companies, insurance agents, express companies, and express agents, telegraph

companies, light, power and water companies, telephone companies, manufacturing and other corporations or institutions, automobile agencies, and dealers, public garages, automobile repair shops or both combined, dealers in automobile accessories, gasoline filling stations, soft drink stands, ice cream stands, ice cream and soft drink stands combined, soda fountains, street railroad cars, omnibuses, drays, transfer and all other vehicles, traveling and auction stores, plumbers, and all other business, trades and avocations whatsoever . . ..

Mo.Rev.Stat. § 94.270.1. This Missouri law gives the Defendant City the authority to regulate and license all businesses within the City of Valley Park. Furthermore, this authority, granted to the City by Missouri law, was held by the Missouri Supreme Court to include the power to revoke. *See Horton v. Clark*, 293 S.W. 362, 366 (Mo. 1927) ("[T]here is no possible distinction in this respect between refusing to grant a license and revoking one already granted. Both acts are an exercise of the police power."); *see also McClellan v. Kansas City*, 379 S.W.2d 500, 504 (Mo. 1964) ("The police power is such that any trade, calling, or occupation may be reasonably regulated in the interest of the public welfare if the general nature of the business is such that, unless regulated, many persons may be exposed to hazards and misfortunes against which the legislative body can properly protect them." (internal citation omitted)). The Court concludes that the City not only has the authority to issue business licenses upon the terms articulated in the Ordinance, it also has the authority to revoke that license upon violation of the Ordinance.[35] This conclusion further negates Plaintiffs' argument that a city is limited by Missouri statute to imposing a fine of no more than $500.00 and imprisonment of not more than 90 days. Mo.Rev.Stat. § 79.470. This statute refers to penalties that may be imposed for ordinance

_____

[35]Plaintiffs assertion that the Ordinance is not a licensing law and therefore cannot impose such a penalty would lead to an unreconcilable result. It would allow a City to impose the restrictions against hiring illegal aliens upon business entities, if those restrictions were written into the same ordinance that provides for the issuance of a business license. However, it would disallow such a result in the case here, where a separate ordinance is passed to place additional restrictions on the issuance of a business license. There is no difference between these two scenarios. Both involve the issuance of a business license, and therefore both are licensing laws.

violations in general.  However, the specific provisions on licenses clearly allow for the imposition of the revocation of a license, thereby making the provision regarding fines and prison time inapplicable.  The Court concludes that the Ordinance at issue does not violate Missouri law.

### D.  CONCLUSION

The Court concludes that Plaintiffs have failed to provide sufficient evidence to create a genuine issue of material fact on any of the allegations in support of their motion for a preliminary injunction.  The Ordinance at issue is not preempted by federal law, to the contrary, federal law specifically permits such licensing laws as the one at issue.  Furthermore, Plaintiffs lack standing to bring their claim of an equal protection violation, and in the alternative, they have failed to provide any evidence supporting a constitutional violation on this basis.  The Court also finds that Plaintiffs due process claim fails.  To satisfy due process, a governmental entity must provide sufficient pre and post-deprivation process before infringing upon a property right.  The Ordinance unquestionably provides such process.  A business entity is given an opportunity to contest any complaint against it, and is entitled to challenge any suspension of a license, all the way through the judicial process, if necessary.  Lastly, the Court concludes that the Ordinance at issue does not violate Missouri law.  For these reasons, the Court concludes that Plaintiffs' claim for injunctive relief cannot succeed, and judgment is appropriately granted in favor of Defendant.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Issuance of a Declaratory Judgment [doc. #50] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [doc. #53] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment [doc. #73] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Sanctions [doc. #117] is **DENIED**.

Dated this <u>31st</u> Day of <u>January,</u> 2008.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE